RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
JAMES E. WEAVER
YEN JEANNETTE TRAN
RYAN S. WATSON
Tax Division, U.S. Department of Justice
P.O. Box 683
Washington, D.C.  20044
(202) 305-4929 (v)
 (202) 307-0054 (f)
James.E.Weaver@usdoj.gov

*Of Counsel:*
MCGREGOR W. SCOTT
United States Attorney
Eastern District of California

Attorneys for Defendant (Moving Party)
JEAN NOLL


PETER BORENSTEIN
P.O. Box 885
Culver City, CA 90232
(213) 362-8740 (tel)
(877) 460-3681 (fax)
peter@brnstn.org


Attorney for Plaintiff (Opposing Party)
SHELLY IOANE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLY J. IOANE,<br><br>              Plaintiff,<br><br>       v.<br><br>JEAN NOLL,<br><br>              Defendant. | Case No. 1:07-cv-00620 AWI EPG<br><br>**JOINT STATEMENT RE DISCOVERY DISPUTES REGARDING DEFENDANT'S MOTION FOR PROTECTIVE ORDER**<br><br>**Judge: Hon. Erica P. Grosjean**<br><br>**Date: July 17, 2020**<br><br>**Time: 10:00 a.m.**<br><br>**Place: Courtroom 10** |

1

13477218.2

This Joint Statement is filed on behalf of counsel for Defendant Jean Noll ("Defendant" or "Ms. Noll") and counsel for Plaintiff Shelly Ioane ("Plaintiff" or "Mrs. Ioane"), pursuant to Local Rule 251, following an informal telephonic discovery dispute conference held on May 26, 2020. (Dkt. No. 529).  Defendant subsequently moved for a protective order on June 9, 2020 (Dkt. No. 534), attaching a proposed protective order.  (Dkt. No. 534-1).

**I.     The Parties Have Met and Conferred Regarding Defendant' Motion for Protective Order**

On May 15, 2020, counsel for Defendant requested an informal telephonic discovery dispute conference, stating that "[t]he purpose [was] to obtain approval for Defendant to move for a protective order covering proprietary or trade secret information contained in test data considered by Rule 26 testifying experts in this case."  Prior to the conference, Defendant had proposed and discussed versions of a draft stipulated protective order with counsel for Plaintiff. However, counsel for the parties were unable to resolve their disagreements.

On May 26, 2020, the parties participated in an informal discovery conference with the Court and addressed a number of topics related to Defendant's request, as reflected in the transcript of the proceedings.  (*See* Dkt. No. 533).  At the conclusion of the conference, the Court granted Defendant permission to move for a protective order but instructed the parties to meet and confer prior to any such filing.  (Tr. at 34:24-35:7).

On May 28, 2020, Plaintiff propounded her Request for Production of Documents, Set One upon Defendant, seeking "[a]ny and all of the underlying data produced during Dr. Winkel's examinations of Propounding Party."

On June 1, 2020, Defendant's counsel emailed a revised proposed stipulated protective order to Plaintiff's counsel.

On June 4, 2020, the parties met and conferred regarding Defendant's proposed stipulation for protective order but were unable to reach an agreement regarding its terms.

2

On June 9, 2020, Defendant filed the instant motion.

**II.      Statement of Nature of the Action as it Relates to Discovery Disputes Raised in Defendant's Motion**

On September 15 & 20, 2015, Dr. Ricardo Winkel, a testifying expert witness retained by Defendant, conducted a court-ordered psychological examination of Mrs. Ioane.

On May 28, 2020, Plaintiff served Defendant with her Request for Production of Documents, Set One. Material portions of the discovery request are reproduced here as follows:

DEFINITIONS:

UNDERLYING DATA refers to all answer sheets, profiles, score sheets, scores, raw data, interpretive reports, graphs of tests results and any other data or results from MCMI-III, PAI, M-Fast, SIRS-2/SIRS and any other testing conducted by Responding Party's retained expert, Dr.Ricardo Winkel, of Propounding Party.

CATEGORY OF DOCUMENTS OR THINGS TO BE PRODUCED:

1.      Any and all of the underlying data produced during Dr. Winkel's examinations of Propounding Party.

- - - - - - -

On June 30, 2020, Defendant propounded her objections and responses to Plaintiff's Request for Production of Documents, Set One, as follows:

Defendant objects to this definition [of UNDERLYING DATA] to the extent that it mischaracterizes an expert witness retained by Defendant to testify at trial as Responding Party's expert, but otherwise utilizes the definition in Defendant's objections and responses, below, to the extent that the definition refers to underlying test data obtained during Dr. Winkel's examination of Plaintiff Shelly

Ioane in September 2015.

RESPONSE: Defendant Jean Noll objects to this request to the extent it seeks production of UNDERLYING DATA that contains proprietary or trade secret information, in the absence of a suitable protective order.  Defendant further objects to this request in that it seeks production of UNDERLYING DATA prior to resolution of Defendant's pending motion for protective order filed on June 9, 2020 (Dkt. No. 534) and set for a hearing on July 17, 2020 regarding, among other things, the UNDERLYING DATA.  Defendant further objects to this request to the extent that it seeks to further Plaintiff's baseless and improper intention to utilize the production of the UNDERLYING DATA through counsel as grounds for seeking to disqualify Dr. Winkel as an expert witness, or to otherwise "litigate" the production of the UNDERLYING DATA through counsel as a purported ethics violation.  (See Tr. of Informal Discovery Dispute Conference of May 26, 2020 at 11:6-8 & 13:22-25).

Subject to resolution of Defendant's pending motion and/or entry of an order equivalent to the proposed order accompanying Defendant's motion (Dkt. No. 534-1), Defendant will produce to Plaintiff's counsel the following UNDERLYING DATA:

1.      M-FAST Interview Booklet (filled in);

2.      SIRS-2 Interview Booklet (filled in);

3.      Personality Assessment Inventory (filled in);

4.      MCMI-III Answer Sheet (filled in);

5.      DAPS Answer Sheet (filled in);

6.      Personality Assessment Inventory Interpretive Report;

7.      MCMI-III Interpretive Report;

8.      DAPS Interpretive Report.

The transcript of the examination by Dr. Winkel of Plaintiff on September 15 & 20, 2020[1] (previously provided to counsel for Plaintiff) also includes discussion of test information and/or questions.

---

[1] The correct date is September 15 & 20, 2015.  The response was corrected on July 2, 2020.

- - - - - - -

The issue now before the Court is whether Defendant has good cause for the protective order Defendant has submitted to the Court.

**III.  Contentions of the Parties Regarding the Discovery Disputes Regarding Defendant's Motion for Protective Order**

**A.  Contentions of Defendant**

<u>Introduction</u>

For good cause pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, Defendant seeks a protective order for two reasons:  (1) to address how mental health tests administered by Rule 26(a)(2) experts in this case may be utilized, transmitted and disclosed; and, (2) out of an abundance of caution, to conform disclosure of protected information to the requirements of a complex Privacy Rule promulgated pursuant to HIPAA, even though Plaintiff's assertion in her earlier submission to the Court that HIPAA applies here is most likely incorrect.

To be clear, Mrs. Ioane does not have substantive privacy rights in information or records compiled by her treating physicians, nor does she have any such rights in with respect to information complied by testifying mental health experts in this case.  By bringing suit, she waived any such rights.

But certain psychological tests commonly administered by mental health practitioners contain proprietary and trade secret information that courts have found merit protection. Defendant seeks to protect such information here, while balancing protection afforded to test information with the need for counsel for the parties to prepare for trial and conduct thorough cross-examinations of testifying experts retained by an opposing party.  Defendant also seeks to clarify, in accordance with discussions with the Court during an informal discovery dispute conferences held on April 23, 2020 and May 26, 2020, that transmission of testing data through

13477218.2

counsel is an appropriate means of addressing discovery requests from an opposing party for test information.  Indeed, Plaintiff seemingly wishes to have her proverbial cake and eat it too:  she has complained that transmission of test data obtained by Dr. Winkle to an expert she retained, Dr. Borys, through counsel, constitutes a purported ethical violation, yet she now plans to compound that "violation" by promulgating a request for production that would transmit the test data to her own counsel.  The proposed order addresses these issues.

Plaintiff has also erroneously asserted that transmission of test data violates HIPAA.  But Dr. Winkel, in his role as a forensic psychologist and testifying expert, is not a health care provider engaging in a transaction covered by the Privacy Rule promulgated pursuant to HIPAA.  Nevertheless, the Privacy Rule is complex and has gone through a number of iterations.  Out of an abundance of caution, Defendant has crafted the proposed order to be a qualified protective order under the Privacy Rule, thereby alleviating any of Plaintiff's HIPAA-based concerns.

Background

Dr. Winkel is a licensed psychologist with a doctoral degree in psychology and post-doctoral training in psychoanalysis, forensic psychology, and neuropsychology.  (Declaration of Ricardo Winkel, July 9, 2020 at ¶¶ 1-2).   Dr. Winkel examined Ms. Ioane in 2015, and he issued a report on November 30, 2015.  (*Id*. at ¶¶ 6-7).  In that report, Dr. Winkel concluded that his findings "are not consistent with and do not support [Mrs. Ioane's] claim that the [June 8, 2006] search constitutes a substantial factor in the causation" of her symptoms of distress.  (*Id*. at ¶ 8).  Dr. Winkel further concluded that Mrs. Ioane "magnified" her symptoms and "misattributed their source to the search."   (*Id*.)

During his examination of Plaintiff, Dr. Winkel administered the following assessments or tests developed by third parties:  (1) Miller's Forensic Assessment of Symptoms (M-FAST); (2) Structured Interview of reported Symptoms, Second Edition (SIRS-2); (3) Millon's Multiaxial

6

13477218.2

Clinical Inventory, 3rd Edition (MCMI-III); (4) Personality Assessment Inventory (PAI); and (5) Detailed Assessment of Post Traumatic Symptoms ("DAPS").  (*Id*. at 9.)  In addition, a recording of the examination was made.  (*Id*. at 6.)  Copies of Dr. Winkel's ensuing report, as well as copies of the court-authorized recording of the examination (which, in places, discusses the testing) have previously been provided to Plaintiff's counsel.

In early April 2020, Dr. Winkel received an authorization form, purportedly signed by Plaintiff, requesting that certain information be provided to Dr. Debra Borys.  (*Id*. at 10.)  That request was for "all answer sheets, profiles, score sheets, scores, raw data, interpretive reports, graphs of test results and any other data or results from MCMI-111, PAl, DAPS, M-Fast, SIRS-2/SIRS and any other testing conducted by him of Shelly Olson-Ioane."  (*Id*. at 11).

Plaintiff's counsel had not provided any notice to Defendant of this contact by Dr. Borys to Dr. Winkel, a Rule 26 testifying expert retained by Defendant.  Appropriately, Dr. Winkel contacted counsel for Defendant, informing counsel of the contact, which had occurred outside of the normal channels of communication through counsel, and counsel for Defendant wrote to Plaintiff's counsel, indicating that the requested information should flow through counsel, given Dr. Winkel's status as testifying expert.  (**Exhibit 1** to Weaver Declaration, at p. 3) (highlights added).

During an informal telephonic discovery dispute conference on April 23, 2020, Plaintiff's counsel raised Dr. Borys's request with the Court, contending that "it's not correct to identify it as something that counsel needs to be involved with. . . . " and that the requested information "is not a part of the discovery thing. . . ."  (*See* Dkt. No. 532 at 51:20 – 52:4).

In response, the Court stated:

I guess I -- I don't feel strongly about whether it goes through counsel except that it has to be done promptly, and it sounds like it is not being done. So I don't necessarily have an objection, but I don't -- I understand that independent medical experts are somewhere in between.  Certainly it's true that you don't -- opposing

counsel doesn't usually speak to your retained expert, and I appreciate that this might be so formulaic you just say I need this information and it's not wrong to ask, but I also don't have an objection to working through counsel as long as counsel does it pretty promptly.

(*Id*. at 52:11-21)

Defendant's counsel then indicated, "Unless I can find something that would suggest otherwise, I do think the appropriate thing for retained experts would be to go through counsel. Ms. Ioane here has waived her – our confidentiality by putting this at issue and having opposing experts."  (*Id*. at 53:1-6).

The Court then concluded:

**Okay. Why don't you do that, and as long as you're doing it quickly and coordinating it, I don't think that there's any issue with it.** And, if there's not, let's do another informal conference. If you -- if you need something fast and, Mr. Borenstein, you don't think you're getting it, then just contact the clerk.

(*Id*. at 53:10-15) (emphasis added).

Counsel for Plaintiff responded, "Okay. Thank you, your Honor."  (*Id*. at 53:16).

Following the informal conference, on April 27, 2020, Dr. Winkel transmitted to Defendant's counsel, by secure and encrypted transmission, copies a Personality Assessment Inventory Interpretive Report; MCMI-III Interpretive Report and DAPS Interpretive Report generated in connection with the 2015 examination of Plaintiff.  (Winkel Decl.¶ 12).  On May 2, 2020, Dr. Winkel transmitted to Defendant's counsel, by secure and encrypted transmission, copies of  M-FAST Interview Booklet (filled in); SIRS-2 Interview Booklet (filled in); Personality Assessment Inventory (filled in); MCMI-III Answer Sheet (filled in); and DAPS Answer Sheet (filled in) generated in connection with the 2015 examination of Plaintiff. [2]  (*Id*. at ¶ 13).  Dr. Winkel transmitted these items with the expectation that the information would be

---

[2] Defendant is willing to submit the eight items identified in her response to Plaintiff's request for production (listed in Part II.A, above) for in camera review, if requested by the Court.

8

transmitted to Plaintiff's counsel and that the information would be kept confidential and/or used for purposes of this litigation.  (*Id*. at Decl. ¶ 14).

It turned out that Plaintiff's counsel was not "okay" with the means of transmission discussed during the April 23, 2020 conference. Rather, Plaintiff's counsel asserted that transmission of test information by Dr. Winkel to Defendant's counsel would constitute an ethics violation and "grounds for his disqualification as an expert." (*See* **Exhibit 2** to Weaver Decl.) (highlights added).   On May 1, 2020, Defendant's counsel indicated that after further consultation with Dr. Winkel, it would be appropriate to transmit test information pursuant to a stipulated protective order, and counsel transmitted a draft stipulated protective order.  (**Exhibit 3** to Weaver Decl.) (highlights added).    Counsel could not agree on the terms of an order, and on May 7, 2020, Plaintiff's counsel seemingly withdrew Dr. Borys's request.  (*See* **Exhibit 4** to Weaver Decl.) (highlights added).

The dispute over Defendant's intention to seek a protective order resulted in a second informal telephonic discovery dispute conference, held on May 26, 2020.  Counsel for Plaintiff reiterated his claim that the transmission of test data by Dr. Winkel to counsel for Defendant was unethical, and further indicated that Plaintiff planned to litigate the matter.  (Dkt. No. 533 at 7:8-9; 13:24-25).  In a letter brief submitted in advance of the conference, Plaintiff also asserted that disclosure of the test information violated HIPAA.

Following discussion over whether Plaintiff was, at the time of the conference, still seeking the test information, the Court stated:

> At this point -- at this point, Mr. Borenstein, with you saying that -- with your very small reference in a letter that you might get it from another way that you thought did allow you to seek it from a third party subpoena, also that what I think is acceptable use you now are going -- you have said that you're going to accuse a doctor of being unethical, I think I agree with Mr. Weaver.  It is -- if I were Mr. Weaver, I'd probably want an order at this point now about what he can and cannot do so that he can protect himself and his client, and I -- I can see why he wants it.

9

13477218.2

(Dkt. No. 533 at 21:4-14).

A discussion over the contents of a proposed order then ensued, and the Court granted Defendant permission to move for a protective order, provided that the parties first meet and confer following the conference.  (*Id*. at 34:25-35:25).

On May 28, 2020, Plaintiff propounded a discovery request, seeking "[a]ny and all of the underlying data produced during Dr. Winkel's examinations of Propounding Party."  (**Exhibit 5** to Weaver Decl.)

On June 1, 2020, Defendant transmitted a proposed stipulated protective order, similar in substance to the proposed order at issue here, except styled as a stipulated order.  (**Exhibit 6** to Weaver Decl.) (cover email and "clean" version of draft stipulated protective order included in the exhibit).

On June 4, 2020, the parties met and conferred regarding, among other things, the proposed stipulated protective order.  The parties did not reach agreement.

On June 9, 2020, Defendant moved for a protective order (Dkt. No. 534) and submitted the proposed order at issue.  (Dkt. No. 534-1).

On June 29, 2020, Defendant timely responded to Plaintiff's request for production, raising three objections to the request and conditioning transmittal of responsive materials on the entry of a protective order.  (**Exhibit 7** to Weaver Decl.)

In light of the above, Defendant has included a series of proposed "whereas" clauses in the proposed order.  Those clauses reflect the factual bases (including Plaintiff's requests and actions) for demonstrating good cause for the proposed protective order.

Legal Analysis

The only controlling authority governing use of psychological testing data generated by a testifying expert in a civil matter that Defendant has located is Rule 26(a)(2) of the Federal Rules

10

13477218.2

of Civil Procedure.  Pursuant to that authority, the disclosure of an expert witness who is retained

or specially employed to provide expert testimony in a civil matter must be accompanied by a

report that includes not only "a complete statement of all opinions the witness will express and

the basis and reasons for them," but also "**the facts or data considered** by the witness in forming

them."  Fed. R. Civ. P 26(a)(2)(B)(i) & (ii) (emphasis added).  This is not an optional provision.

It is to be complied with.

That said, several federal district courts have found that the proprietary and trade secret

materials contained in psychological test materials merit, in whole or part, protection from public

disclosure, in part due to obligations of licensed psychologists to conform to state laws and/or

ethical standards.

The most cogent analysis of the issue is found in a Colorado federal district court's ruling

on efforts by a party to obtain tests administered by an expert, including the MCMI-III test, in

connection with a subpoena for the expert's deposition.  *See Frazier v. Board of County Comm'rs*

*of County of Arapahoe*, No. 08–cv–02730–WYD–BNB, 2010 WL 447785, at *3-4 (D. Colo. Feb.

3, 2010), *overruling objections*,  2010 WL 11553297 (D. Colo. Jun. 24, 2010).  In *Frazier*, the

starting point of the analysis was Rule 26.  Under that rule, "all parties and the court should

possess full information well in advance of trial on any proposed expert testimony or

demonstrative evidence."  2010 WL 447785 at *4 (internal citations omitted).  Full information to

be disclosed includes "***the data or other information considered by that witness in forming***

***those opinions***."  *Id*.  (internal citations omitted) (emphasis in original).

In *Frazier*, the plaintiffs had produced redacted copies of an expert's report and moved for

a protective order when the defendant subpoenaed the expert for deposition and production of test

documents.  The plaintiffs moved to relieve the expert from having to produce the documents,

claiming that: (1) the subpoena would require the expert to violate ethical guidelines of the

11

13477218.2

American Psychological Association ("APA"); (2) the psychological tests had already been directly disclosed to an expert retained by defendant; and (3) the publisher of the tests considered the tests to be trade secrets. *See id*. at *3.

The court in *Frazier* reasoned that entry of a prior protective order sufficed to alleviate concerns regarding ethical standards, noting that APA standard 9.04(b) expressly permitted sharing of test data "as required by law or court order." [3] *Id*. at 4; *see also Schmitt v. Beverly Health and Rehab. Services, Inc.*, Civ. 96-2537-EEO, 1997 WL 728133, at *4 (D. Kan. Nov. 19, 1997) (where doctor raised issue of releasing "raw data" and copyrighted materials to attorneys, the entry of protective order "negate[d] any need to determine whether contractual and ethical duties provide a sufficient basis to withhold production of such documents from disclosure").

Importantly, the court in *Frazier* rejected as inadequate the mere direct expert-to-expert provision of test information, noting that the consulting expert for defendant had not shared the test data with counsel.  Moreover, the court observed:

> In any event, ***it is defense counsel, and not an IME doctor***, who must have the Psychological Tests to evaluate the strength of Dr. Kenneally's opinions and, potentially, to prepare her cross-examination.

2010 WL 447785 at 4 (emphasis added).

In a later case pending in the United States District Court for the District of Colorado involving a dispute over whether test materials and data could be shared with counsel in the case, the court opined:

---

[3] Although the *Frazier* case addresses test data under APA standard 9.04, another standard regarding test materials, APA standard 9.11, also qualifies a psychologist's obligations to be "consistent with law and contractual obligations."  (*See* APA *Ethical Principles of Psychologists and Code of Conduct*, https://www.apa.org/ethics/code).  As such, compliance with Rule 26 is required for test materials as well.  In the case of *Gibbs v. Georgia-Pacific*, CV 08-0196-CG-C, 2009 WL 10695341 (S.D. Ala. Feb. 5, 2009), a psychologist sought to quash a subpoena on grounds that she would violate both ethical standards 9.04 and 9.11, were she to disclose test data and test materials to counsel for the opposing party.  *See* 2009 WL 10695341, at *5.  The court compelled production of both test data and test materials, subject to entry of a protective order that contained conditions agreeable to the opposing party, if the expert was to be called as a witness at trial.  *Id*. at *6; see *also Fint v. Brayman Constr. Corp.*, 5:17-CV-04043, at *4 (S.D.W. Va. Jan. 8, 2019).

> However, this court has previously recognized that production of such materials to a party's counsel pursuant to an appropriately tailored protective order obviates any such contractual, ethical or trade secret concerns.

*Ogburn v. Am. Natl. Prop. & Cas. Co.*, 14-cv-02339-LTB-NYW, 2015 WL 5728801, at *4 (D. Colo. Sept. 30, 2015) (*citing Frazier*, 2010 WL 447785, at *4).

Some courts have determined that Rule 26 discovery requirements override an expert's privilege or ethical concerns. *See Sapone v. Grand Targhee, Inc.*, No. 00–CV–020–J, 2000 WL 35615926, at *2 (D.Wyo. Aug.9, 2000) (court ordered production of psychological raw data testing without restriction to party, noting the party was "entitled to cross examine plaintiffs' expert witnesses on all information considered by these experts to arrive at their ultimate opinions"); *Kayongo–Male v. S.D. State Univ.*, No. 04–4172, 2008 WL 2627699, at *4 (D.S.D. July 3, 2008) (Court ordered production of raw statistical data, including confidential data, to party that opposing party's expert relied upon); *see also Hirschheimer v. Associated Metals & Minerals Corp.*, 94 Civ. 6155 (JKF), 1995 WL 736901, at *5 (S.D.N.Y. Dec. 12, 1995) (pursuant to Rule 26(a)(2)(B), defendant was required to "disclose the raw data" from a psychological test to be administered to plaintiff, if defendant intended to call either of two doctors as expert witnesses at trial).

Moreover, the approach taken by the court in *Frazier* is similar to the approach taken by this Court in *Tibbs v. Adams*, No. CIV S-05-2334-LKK-KJM, 2008 WL 2633233, at *1-3 (E.D. Cal. June 25, 2008). In *Tibbs*, this Court held a party was entitled to psychological test materials, including test data, relied on by an expert retained by the opposing party. Though *Tibbs* was a criminal habeas case, the Court, citing *Southern Union Company v. Southwest Gas Corporation*, 180 F.Supp.2d 1021, 1059 (D.Ariz.2002), referred to Fed. R. Civ. P. 26(a)(2), in requiring disclosure of such material. Moreover, the Court acknowledged that a court order directing release of such material would resolve any ethical issues with disclosure. *Id.* at *2 (*citing United*

13

13477218.2

*States v. Samples*, 2004 WL 759567 (D.Minn.2004); *Chiperas v. Rubin*, 1998 WL 765126 (D.D.C.1998)).

Some courts have been more deferential to psychologists' ethical concerns. *See e.g., Wayne v. Officer Ralph Kirk #21*, No. 13 C 8540, 2016 WL 492338, at *9 (N.D. Ill. Feb. 9, 2016) (allowing disclosure of certain test data, denying the copying of certain test materials, but allowing counsel to review such materials); *Collins v. TIAA-CREF*, No. 3:06CV304-C, 2008 WL 3981462, at *5 (W.D.N.C. Aug. 22, 2008) (quashing subpoena to psychologist who raised ethics issues and only permitting transmittal to another licensed psychologist); *Taylor v. Erna*, No. CIVA 08-10534-DPW, 2009 WL 2425839, at *2-3 (D. Mass. Aug. 3, 2009) (authorizing production of psychological raw data and testing material to opposing party's expert);[4] *Walton v. N. Carolina Dep't of Agric. & Consumer Servs.*, No. 5:09-CV-302-FL, 2011 WL 2893622, at *2 (E.D.N.C. July 15, 2011) (denying a motion to compel and citing to the *Collins* case); *Snipes v. United States*, No. 18-CV-03259-TSH, 2020 WL 1289532, at *6 (N.D. Cal. Mar. 18, 2020) (Subject to protective order, court ordered production of written psychological reports and "any related reports of psychological testing whether done by computer scoring, hand scoring, or anything else", but not "examination materials that are protected by trade secret law and ethical obligations of psychologists.").

None of the above cases address a competing ethical concern for forensic psychologists to provide "all information that is in their records …" to a retaining party. *See Specialty Guidelines for Forensic Psychology*, https://www.apa.org/practice/guidelines/forensic-psychology, ("*Guidelines*") Sections 8.02 (Access to Information); *see also* Sections 10.06 (Documentation and Compilation of Data Considered) & 10.07 (Provision of Documentation); *compare Ethical*

---

[4] Although *Taylor* cites to the case of *Detroit Edison Co. v. N.L.R.B.*, 440 U.S. 301 (1979), that opinion appears to concern the scope of obligations and actions under a provision of the National Labor Relations Act, and is therefore inapposite here.

*Principles of Psychologists and Code of Conduct*, https://www.apa.org/ethics/code, Sections 1.02; 4.05, 6.01, 9.04 & 9.11. Section 8.02 of the *Guidelines* states:

> If requested, forensic practitioners seek to provide the retaining party access to, and a meaningful explanation of, all information that is in their records for the matter at hand, consistent with the relevant law, applicable codes of ethics and professional standards, and institutional rules and regulations.  Forensic examinees typically are not provided access to the forensic practitioner's records without the consent of the retaining party.  Access to records by anyone other than the retaining party is governed by legal process, usually subpoena or court order, or by explicit consent of the retaining party. . . .

*Guidelines*, Section 8.02.

Therefore, access of information gathered by a forensic psychologist, such as Dr. Winkel here, to anyone other than the retaining party, including the examined party, appears to be governed by legal process or consent of the retaining party.  *See Guidelines*, Section 8.02.

Based on the foregoing, Defendant has incorporated provisions in the proposed protective order to address the proprietary and protected nature of the test information sought by Plaintiff (and, reciprocally, that Defendant will seek from Dr. Borys, should she conduct an examination of Plaintiff.  Paragraphs 1-2 outline information that is to be protected and the procedure to identify and designate such information as "Protected Information." Paragraphs 3 through 9 are consistent with Rule 26 and set forth a process through which civil litigation can effectively proceed under the Federal Rules of Civil Procedure while also taking into account the confidential nature of test information.

Defendant includes Paragraph 7 in her proposed order to specifically address the means of transmission of test data in this case, subsequent to the first of two informal discovery dispute conferences when the means of transmission was first discussed with the Court.

> The HIPAA Privacy Rule does not govern disclosure of information arising out a forensic expert's examination of Plaintiff, but, in an abundance of caution, Defendant's proposed order has been drafted to constitute a qualified protective order under HIPAA

Congress passed the Health Insurance Portability and Accountability Act ("HIPAA") in

15

1996.  Pub. L. 104–191, August 21, 1996, 110 Stat 1936.  The law sought to improve the

portability and continuity of health care coverage in an increasingly electronic world.  *See* H.R.

104-736 at p. 177 (Joint Explanatory Statement of the Committee of Conference) (excerpt from

H.R. 104-736 attached to Weaver Decl., as **Exhibit 8**).  As part of HIPAA, Congress requested

recommendations from the Secretary of Health and Human Services ("HHS") regarding the

privacy of individually identifiable health information.  Pub. L. 104-191, Title II, § 264(a); *see*

*also* **Exhibit 8** at p. 102.  If Congress did not legislate privacy standards within three years, HHS

was authorized to promulgate regulations regarding the privacy of such information.  *Id*. at §

264(c).  Congress did not legislate such standards, and HHS issued final privacy regulations.  *See*

Fed. Reg.  Vol. 65 No. 250 pp. 82462-82829, "Standards for Privacy of Individually Identifiable

Health Information" 45 C.F.R. Parts 160 & 164.  (Electronic link to PDF copy of December 28,

2000 publication can be accessed at: https://www.hhs.gov/hipaa/for-

professionals/privacy/index.html).

      The regulations have become known as the Privacy Rule.[5]

      The Privacy Rule applies only to health plans; health care clearinghouses; and health care

providers who transmit "any health information in electronic form in connection with a

transaction covered by this subchapter."  45 C.F.R. §§ 160.102 & 164.104.  (The subchapter,

Subchapter C, is entitled "Administrative Data Standards and Related Requirements," and it

includes 45 C.F.R. Parts 160 & 164.)  The definition of what constitutes a "transaction" under

Subchapter C is as follows:

> Transaction means the transmission of information between two parties to
> carry out financial or administrative activities related to health care. It
> includes the following types of information transmissions:

---

[5] After publication of the final Privacy Rule in late 2000, the rule was reopened for comment and was reissued as a final rule on August 14, 2002, with some modifications.  *See* Fed. Reg.  Vol. 67 No. 157 at 53182-272.  Further changes have ensued.  See Fed. Reg.  Vol. 78 No. 17 (1-25-2013) at 53182-272.

(1) Health care claims or equivalent encounter information.
(2) Health care payment and remittance advice.
(3) Coordination of benefits.
(4) Health care claim status.
(5) Enrollment and disenrollment in a health plan.
(6) Eligibility for a health plan.
(7) Health plan premium payments.
(8) Referral certification and authorization.
(9) First report of injury.
(10) Health claims attachments.
(11) Health care electronic funds transfers (EFT) and remittance advice.
(12) Other transactions that the Secretary may prescribe by regulation.

45 C.F.R. § 160.103.

Even a cursory review of what constitutes a transaction for purposes of HIPAA reveals that a forensic psychologist or other medical practitioner, retained and paid by a litigant for purposes of testifying in court (as opposed to being paid by a health plan or patient), and who conducts a court-ordered examination or other litigation activity, is not engaging in an activity that falls within the boundaries of the Privacy Rule.  In a somewhat analogous situation, two doctors retained as consulting experts in litigation sought to quash subpoenas because, among other things, the production of the records would violate HIPAA.  *In re Asbestos Products Liab. Litig. (No. VI)*, 256 F.R.D. 151, 154–55 (E.D. Pa. 2009).  The Court disagreed.

> It is uncontested that Doctors Segarra and Rao do not qualify as "covered entities" under HIPAA either as a "health plan" or a "health care clearinghouse". Nor are Doctors Segarra and Rao "health care providers" because they were not consulted by the Plaintiffs for physician services, but rather for the purposes of obtaining a diagnosis to be relied upon in initiating an asbestos personal injury suit. See 45 C.F.R. § 160.103; 42 U.S.C.A. §§ 1395x(u), (s). **Because Doctors Segarra and Rao did not provide physician services to plaintiffs, they are not covered entities under HIPAA and, therefore, HIPAA does not prevent enforcement of the subpoenas.**

*Id*. (emphasis added).

Although the Privacy Rule does not appear to expressly address the situation at issue here, the HHS discussion accompanying the final rule promulgated in December 2000 indicates that a health practitioner may wear multiple hats, some of which fall within the scope of HIPAA and

17

some which do not:

> Comment: One commenter expressed confusion about those instances when a
> health care provider was a covered entity one day, and one who ''works under a
> contract'' for a manufacturer the next day.

> Response: If persons are covered under the rule in one role, they are not
> necessarily covered entities when they participate in other activities in another
> role. For example, that person could be a covered health care provider in a hospital
> one day but the next day read research records for a different employer. In its role
> as researcher, the person is not covered, and protections do not apply to those
> research records.

Fed. Reg. Vol. 65 No. 250 at p. 82575 (part of Section III ("Section-by-Section Discussion of

Comments," addressing comments on Section 160.103 ("Definitions") and specifically, regarding

the term "Health Care Provider") (Text highlighted in **Exhibit 9** to Weaver Decl.)

    Accordingly, the mere fact that Dr. Winkel may sometimes conduct examinations and

administer tests in the role of a health care provider does not mean that work performed in a role

as a testifying expert retained by counsel is somehow, by osmosis, also an activity covered by

HIPAA.

    Finally, a claim by Plaintiff that HIPAA applies to Dr. Winkel's activities has already

been addressed – and rejected – by the Court in the context of discussing the recording of the

examinations of the Ioanes, as well as general medical records used.  (*See* Dkt. No. 335 at p. 3

lines 7-16).  Analytically, the present dispute over testing data is no different than the issue earlier

addressed by the Court in 2015.

    In short, there is no basis for arguing that Dr. Winkel's examination (or materials

generated during the examination) is covered by HIPAA.

    That said, psychologists are not in agreement as to the extent that HIPAA covers their

litigation-related activities.  *See e.g.*, Knapp, Samuel J. et al, <u>Practical Ethics for Psychologists:  A

Positive Approach</u>, Chapter 9 at 180 (2017) (concluding forensic services for an attorney are

"probably" exempt from HIPAA).[6]

Moreover, the Privacy Rule is admittedly complex.  Regulatory materials are voluminous.

Accordingly, out of an abundance of caution, Defendant's proposed order incorporates two

provisions of the procedural subsection addressing disclosures of covered information in judicial

proceedings pursuant to a "qualified protective order."  *See* 45 C.F.R. 164.512(e).  In particular,

Defendant's proposed order effectively:

> (A) Prohibits the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested; and
> (B) Requires the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding.

45 C.F.R. § 164.512(e)(v).

Defendant's proposed order addresses the two prongs of the above provision in

Paragraphs 10 and 11.

Plaintiff has waived any substantive privacy rights to medical information by bringing suit
for alleged emotional distress and trauma

To be clear, by crafting a qualified protective order compliant with the Privacy Rule,

Defendant is not conceding that Plaintiff has any substantive privacy rights to medical

information relating to her claims in this litigation.  To the contrary:

> All that 45 C.F.R. § 164.512(e) should be understood to do, therefore, is to create a procedure for obtaining authority to use medical records in litigation. Whether the records are actually admissible in evidence will depend among other things on whether they are privileged.

*N.W. Meml. Hosp. v. Ashcroft*, 362 F.3d 923, 925–26 (7th Cir. 2004).

By expressly placing her alleged emotional distress at issue in this case, Mrs. Ioane

---

[6] *See* http://web.b.ebscohost.com/ehost/detail/detail?vid=0&sid=dbe62b6e-6a57-4c0f-b8fa-5c73db41a525%40pdc-v-sessmgr06&bdata=JnNpdGU9ZWhvc3QtbGl2ZQ%3d%3d#AN=1677249&db=nlebk

"waived any privilege protecting [her] psychological records . . . ." *See Maynard v. City of San Jose*, 37 F.3d 1396, 1402 (9th Cir. 1994), as amended (Nov. 22, 1994) (citation omitted); *Lahrichi v. Lumera Corp.*, 433 F. App'x 519, 521 (9th Cir. 2011); *see also Busselman v. Battelle Meml. Inst.*, 4:18-cv-05109-SMJ, 2019 WL 7763824, at *1-2 (E.D. Wash. June 18, 2019) (no constitutional right to privacy existed beyond waived psychotherapist privilege); *E.E.O.C. v. California Psychiatric Transitions*, 258 F.R.D. 391, 400 (E.D. Cal. 2009) (applying "broad approach" to waiver of psychotherapist privilege). Plaintiff has waived any privileges to shield her medical information from use in this litigation.

### B.     Contentions of Plaintiff

Federal Rule of Civil Procedure 26(c) governs the granting of a protective order. A protective order should be granted when the moving party establishes good cause for the order and "justice requires [a protective order] to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . . ." Fed. R. Civ. P. 26(c). "For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips v. General Motors Corp.,* 307 F.3d 1206, 1210–11 (9th Cir. 2002). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Industries, Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 476 (9th Cir. 1992).

Here, Defendant has not enunciated what harm or prejudice she will suffer by providing Mrs. Ioane with the requested underlying data without a protective order. Indeed, Defendant will not suffer any harm or prejudice at all. The only party that might suffer prejudice or harm by the release of the underlying data, which Defendant admits is Mrs. Ioane's protected health information, is Mrs. Ioane herself; Agent Noll certainly does not have an interest in protecting her adversary's privacy, especially over Mrs. Ioane's own objection, by the imposition of a protective

13477218.2

1   order. Meanwhile, Defendant is not the copyright holder for any personality test nor is she the

2   owner of any trade secret related to the personality tests. Therefore, Defendant cannot make a

3   showing of good cause for a protective order as required by Rule 26(c). The Court should deny

4   the instant motion and order the release of the underlying data to Mrs. Ioane within ten days.

5

6

7                              **(signature blocks follow on next page)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13477218.2

Dated:  July 10, 2020

Respectfully submitted,

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

*/s/ James. E. Weaver*
JAMES E. WEAVER
Senior Litigation Counsel
YEN JEANNETTE TRAN
Trial Attorney
U.S. Department of Justice
Post Office Box 683
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 305-4929

*Of Counsel:*
MCGREGOR W. SCOTT
United States Attorney
Eastern District of California

*Attorneys for Jean Noll*

PETER BORENSTEIN

_____
Attorney for Plaintiff
SHELLY J. IOANE

22