RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

JAMES E. WEAVER
Senior Litigation Counsel
YEN JEANNETTE TRAN
RYAN S. WATSON
Trial Attorneys
Tax Division, U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C.  20044
(202) 305-4929 (v)
(202) 307-0054 (f)
James.E.Weaver@usdoj.gov
Y.Jeannette.Tran@usdoj.gov
Ryan.Watson@usdoj.gov

*Of Counsel:*
MCGREGOR W. SCOTT
United States Attorney
Eastern District of California

*Attorneys for Jean Noll*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLY IOANE,<br><br>  Plaintiff,<br><br>  v.<br><br>JEAN NOLL,<br><br>  Defendant. | No.  1:07-CV-00620-AWI-EPG<br><br>**REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR FOLLOW-UP PSYCHOLOGICAL EXAMINATION OF SHELLY IOANE PURSUANT TO RULE 35 OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>Date: September 25, 2020<br>Time: 10:00 a.m.<br>Place: Courtroom 10, 6th Floor<br>Judge: Hon. Erica P. Grosjean |

### I.  Plaintiff advocates for an unfair presentation of expert testimony at trial

This case will be tried to a jury next year.  Both parties intend to present expert testimony

on the causes of Plaintiff's alleged emotional distress:  Plaintiff plans to call Dr. Borys;

Reply in Support of Motion for Follow-up Examination            1
Case No. 1:07-cv-00620-AWI-EPG

Defendant plans to call Dr. Winkel. It is the role of the Court, pursuant to the Federal Rules of Civil Procedure and Federal Rules of Evidence, to ensure that both parties are given a fair opportunity to present evidence in support of their respective cases. In a civil case, that evidence is developed through timely disclosure and timely discovery.

Plaintiff, however, has a history of untimely disclosure and a failure to follow the rules. That pattern persists. Dr. Winkel conducted a Rule 35 psychological examination of Plaintiff in September 2015. Only recently, on August 24, 2020, did Plaintiff reveal that her 2015 examination was, purportedly, something of a sham: she was, she says, too overly-drugged to provide Dr. Winkel with reliable information. There can be no doubt that Plaintiff will contend, and Dr. Borys will opine at trial, that the conclusions drawn by Dr. Winkel based on his 2015 examination are unreliable because Plaintiff was in a drugged-up state. Plaintiff's counsel says as much: "The Borys Report suggests that the results of the psychological testing conducted during the examination may be unreliable given that Mrs. Ioane was overmedicated at the time." (Borenstein Declaration at ¶ 5, Dkt. 571-3).

Under these circumstances, it would be unfair to preclude Defendant from obtaining an order for a follow-up examination. Indeed, if Plaintiff is to be believed, a follow-up examination by Dr. Winkel would be *more* than a mere follow-up. It would be the first time Dr. Winkel would have seen Plaintiff in the more stable mental state she was supposedly in during the June/July 2020 examination by Dr. Borys. Plaintiff does not shy away from the unfairness of placing the two experts on vastly different terrain at trial. Rather, she embraces it, complaining that a follow-up examination would be a "do-over," as though her alleged noncompliance with a court order is someone else's fault. These circumstances, the ongoing nature of Plaintiff's alleged injury, and the significant passage of time since Dr. Winkel examined Plaintiff all constitute good cause for a follow-up examination.

There is additional good cause for compelling a supplemental examination. The 2020 Borys Report addresses issues of Plaintiff's cognition, both at the time of the 2015 examination and also in 2020, at the time of the Borys examination. (*See* Winkel Supp. Declaration, ¶¶ 4-5). But Dr. Borys looked past these issues and failed to administer objective neuropsychological tests

to empirically assess Plaintiff's cognitive status or the validity of Plaintiff's verbally reported cognitive status. (*See* Winkel Supp. Declaration, ¶¶ 6-7). The recent testing conducted by Dr. Borys, as well as Dr. Winkel's testing of Plaintiff in 2015, concerned issues of alleged personality and emotional functioning. (*See id.*) But the alleged disparity in Plaintiff's cognitive functioning over time now merits close examination by Dr. Winkel. To address the opinions reached by Dr. Borys, it is critical to do what she failed to do: administer cognitive and validity testing.

Thus, good cause exists for ordering a follow-up examination.

## II. There are no other viable means for providing Dr. Winkel with information he needs to evaluate Plaintiff's cognition and Plaintiff's present condition

Plaintiff wrongly suggests that Defendant should be satisfied with information that may be gleaned by other means, such as depositions or information contained in medical records. *See* Plaintiff's Response at 8:4-12 (quoting the case of *Winstead v. Lafayette County Bd. of County Commissioners*, 315 F.R.D. 612, 617 (N.D. Fla. 2016)). But Plaintiff's Response omits a key point of analysis in the *Winstead* case, one that clearly supports Defendant's position here:

> **Things are different when a plaintiff seeks to prove her emotional injuries through retained expert, rather than treating physician, testimony.** Although there appears to be near-universal agreement about this principle, *see, e.g., Duncan v. Upjohn Co.*, 155 F.R.D. 23, 25 (D.Conn.1994), courts don't often discuss the reasons behind the difference in treatment. . . .
>
> But one policy-based reason for the difference in treatment seems obvious: a plaintiff should not be effectively punished for seeking treatment, particularly when that treatment was initially sought (as it was here) prior to the onset of litigation. **In contrast, a plaintiff who submits to an evaluation by an expert chosen by her lawyer is not seeking treatment—she's trying to advance her litigation position. Forcing such a plaintiff to submit to a similar examination conducted by a different expert (one likely chosen by the opposing party) is not a punishment, but a leveling of the playing field.**

*Winstead*, 315 F.R.D. at 616 n.3 (emphasis added).

Indeed, "[w]hat does establish good cause and authorizes a Rule 35 examination in this case is the [plaintiff's] stated intent to prove [her] emotional injuries with the testimony of a retained expert." *T.C on Behalf of S.C. v. Metro. Govt. of Nashville and Davidson County, Tennessee*, 3:17-CV-01098, 2018 WL 3348728, at *12 (M.D. Tenn. July 9, 2018).

Reply in Support of Motion for Follow-up Examination        3
Case No. 1:07-cv-00620-AWI-EPG

The idea that one party should be satisfied with "other means" of discovery when the other party is proffering expert testimony runs counter to case law:

> Furthermore, one purpose in granting a request for a psychiatric examination pursuant to Rule 35 is to "preserve[ ] the equal footing of the parties to evaluate the plaintiff's mental state...." *Tomlin*, 150 F.R.D. at 633. **Thus, while plaintiff has produced voluminous medical records and reports, which he claims are sufficient to evaluate his mental state at all relevant times, this production does not necessarily negate the defendant's interest in an independent examination of the plaintiff.** Only if no additional relevant information could be gained by an examination of Mr. Duncan should the motion for a psychiatric examination be denied. *Schlagenhauf*, 379 U.S. at 118, 85 S.Ct. at 242 (holding availability of information from another source is a relevant consideration).

*Duncan v. Upjohn Co.*, 155 F.R.D. 23, 25 (D. Conn. 1994) (emphasis added).

Plaintiff's reliance on the case of *Acosta v. Tenneco Oil Co.*, 913 F.2d 205 (5th Cir. 1990), is misplaced. First, in *Acosta*, unlike this case, the court ruled that the plaintiff had not placed his mental condition in controversy. 913, F.2d at 209. Second, *Acosta* may not even be good law:

> Plaintiff's other objections can be disposed of briefly. (1) [plaintiff] provides no authority, and the Court knows of none, for the proposition that defendant must exhaust all other avenues of discovery before seeking independent mental examinations. (2) *Acosta v. Tenneco Oil Co.*, 913 F.2d 205, 209 (5th Cir.1990), does not assist plaintiff, for it held only that Rule 35 does not authorize a mental examination by a vocational rehabilitation expert, and the holding in *Acosta* appears to have been abrogated by subsequent amendment of Rule 35. *See Fischer v. Coastal Towing Inc.*, 168 F.R.D. 199, 201 (E.D.Tex.1996) ("A 'suitably licensed or certified examiner' under Rule 35 includes a vocational-rehabilitation expert.") . . .

*Jackson v. Entergy Operations, Inc.*, CIV.A. 96-4111 & 97-0943, 1998 WL 28272, at *1 n.1 (E.D. La. Jan. 26, 1998).

Plaintiff's reliance on the case of *Shumaker v. West*, 196 F.R.D. 454 (S.D. W.Va. 2000) is equally unavailing. That case contains no discussion as to whether plaintiff had retained a testifying expert for purposes of litigation, making it inapposite to the facts here.

Plaintiff's position, that Defendant should be satisfied with other means of discovery such as medical records, is especially misplaced given Plaintiff's apparent failure to obtain, let alone produce, medical records that would be relevant to her condition covering the five years after her examination by Dr. Winkel. Nor do the impressions of friends and family substitute for an

Reply in Support of Motion for Follow-up Examination                4
Case No. 1:07-cv-00620-AWI-EPG

1  examination. Friends and family cannot provide an objective and trained assessment of
2  Plaintiff's cognitive functioning or employ standard psychological measures for ascertaining the
3  validity her reported condition.

4  If anything, the deposition testimony obtained thus far from Plaintiff's late-disclosed fact
5  witnesses only reinforces the need for a follow-up examination of Plaintiff by Dr. Winkel. For
6  example, it appears that Plaintiff may be in the process of gathering undisclosed hospital records,
7  as well as undisclosed records from Dr. Castillo, Mrs. Ioane's psychiatrist. (**Exhibit 7**, Excerpt
8  from Tr. of Deposition of Michael Ioane, Jr. on Sept. 2, 2020, at 55:5-60:23; 62:10-66:20,
9  attached to Supplemental Weaver Declaration). In addition, it turns out that Plaintiff may have
10 been keeping a calendar of her visits to Dr. Castillo, something also not previously produced or
11 disclosed. (**Exhibit 8**, Excerpt from Tr. of Deposition of Lesieli Tavake on September 9, 2020, at
12 66:17-68:7, attached to Supplemental Weaver Declaration). Plaintiff is either hiding material
13 documentary evidence relating to her medical condition or planning on introducing evidence at
14 trial that she failed to timely disclose during discovery. Either way, the lack of medical records
15 for the past five years further supports the case for compelling a follow-up examination of
16 Plaintiff.

17 Clearly, information supplied by Dr. Borys, a testifying expert retained by Plaintiff for
18 purposes of this litigation, cannot, and should not, serve as a substitute for a follow-up
19 examination of Plaintiff by Dr. Winkel. That would run counter to one of the purposes served by
20 Rule 35. *See Duncan*, 155 F.R.D. at 25. In addition, Dr. Borys did not administer cognitive tests
21 to Plaintiff. That is, in part, what Dr. Winkel seeks to accomplish in a follow-up examination.
22 Further, Dr. Borys betrays the adversarial nature of her opinions through her highly-selective
23 summary of various evidence in her report. For example, the Borys Report glides past clear and
24 obvious differences between Plaintiff's 2014 identification of the IRS agent who purportedly
25 accompanied Plaintiff, as well as the timing of the purported incident (the agent was the person
26 who "took my arm . . . escorted me into the kitchen . . . and she basically stayed in the kitchen
27 most of the time I was there" – *see* Dkt. No. 512-2 (excerpts from 2014 Deposition) at 39:5-15 &
28

Reply in Support of Motion for Follow-up Examination          5
Case No. 1:07-cv-00620-AWI-EPG

40:5-24)[1] and as retold by Plaintiff to Dr. Borys in 2020 (now two agents are involved and the trip occurs three hours into the search – *see* Borys Report at p. 3, attached as **Exhibit 3-A** to Supplemental Weaver Declaration).  In Dr. Borys's recap of the 2014 deposition testimony of Plaintiff, Dr. Borys tersely notes, in an otherwise free-flowing recap, "[Plaintiff] relates the incident re the bathroom pp 41-2 as previously described in other docs plus she says agent said for her to take clothes off to see not hiding anything and she lifted her sundress to show her . . . ." (**Exhibit 3-A**, at p. 30).   It appears that Dr. Borys's role in this case will be to help extricate Mrs. Ioane from the weight of Plaintiff's past inconsistent, and perhaps fatal, statements by chalking up those statements to cognitive impairment or psychological distress.

Finally, the declaration submitted by Dr. Castillo only highlights the need for a follow-up examination by Dr. Winkel.  That declaration states in conclusory fashion that "Mrs. Ioane's symptoms have not changed significantly . . ." but provides no support for the statement and, moreover, provides no detail as to how he has "adjusted" Plaintiff's medication over the years. (Dkt. No. 571-2 at ¶¶ 6-8).  Dr. Castillo makes no mention of Plaintiff's cognitive functioning in his declaration. (*See id*.).  More generally, the Defendant objects to the submission of the Castillo declaration by Plaintiff and moves to strike it from consideration.  Absent an opportunity to obtain current discovery from Dr. Castillo, he should be restricted in this case from providing evidence that post-dates his 2015 deposition.[2]

In summary, Plaintiff is mistaken in asserting that Defendant's counsel "already have the very information they claim they need," and Plaintiff is completely off-base with respect to her legal analysis.   A follow-up examination is the only means of affording an expert psychologist

---

[1] As Plaintiff and her counsel well understand, this 2014 identification is no minor point. Defendant will provide objective and testimonial evidence at trial demonstrating that the agent Plaintiff identifies was someone other than Ms. Noll.  (*See* Dkt. No. 511-1 at internal p. 3; *see also* Dkt. No. 511 at ¶ 18).

[2] Since Plaintiff has inserted Dr. Castillo into a dispute during expert discovery, Defendant contends that it would be appropriate to serve a subpoena on Dr. Castillo (and/or his employer during the relevant time period) seeking records and deposition testimony about matters that post-date his deposition in 2015, but Defendant will first raise the matter with the Court before proceeding.

retained by Defendant a fair opportunity to assess Plaintiff's current mental state, which she has placed in issue.

### III. Plaintiff misconstrues case law regarding the need for a current examination where Plaintiff alleges permanent injury or changed circumstances

Plaintiff's response creates a false distinction between the need for follow-up examinations in the context of physical injuries versus psychological injuries. Plaintiff does this by selectively focusing on cases where physical injury was at issue, while leaping past the facts of cases cited by Defendant where mental injury was at issue, such as *Ziemann v. Burlington County Bridge*, 155 F.R.D. 497 (D.N.J. 1994) and G*alietti v. State Farm Mut. Auto Ins. Co.*, 154 F.R.D. 262 (D. Colo. 1994).

*Ziemann* is directly on point. There, a change in plaintiff's mental condition was paramount to the Court's decision to order additional examinations under Rule 35, including a second examination by the defendant's psychiatric expert. 155 F.R.D. at 501-02. The court explained:

> Given this significant change in Ziemann's mental condition, it is clear that defendants' current evaluation is incomplete and that the defendants should be allowed to examine plaintiff as to these developments. While the court is loathe to subject plaintiff to unnecessary examination, it must be noted that Ziemann, as the plaintiff in this matter, cannot be permitted to avoid her discovery responsibilities.

*Id.* at 501.

As noted above, Plaintiff alleges a material difference between her condition in 2015 and 2020.

There are two rationales for allowing a follow-up Rule 35 examination in the context of permanent injury.

The first has to do with timing. Courts have found "good cause" to allow multiple examinations where a substantial time lag occurs between the initial examination and trial. *See Sadler v. Acker*, 263 F.R.D. 333, 336 (M.D. La. 2009) (time lag between the initial examinations conducted by defense experts and the time of trial, and a change in Plaintiff's situation since initial exams, constituted good cause for re-examination and testing prior to trial); *Galieti v. State*

*Farm Mutual Automobile Insurance* Co., 154 F.R.D. 262, 263 (D. Colo. 1994) ("The previous . . . professionals have not seen Plaintiff for some period of time. Plaintiff's present . . . condition is at issue. A further evaluation . . . is appropriate").

The second rationale, as acknowledged by Plaintiff, has to do with a change in Plaintiff's condition. Case law is clear that a follow-up examination is such circumstance is needed. *See Ziemann*, 155 F.R.D. at 501-502 (deterioration of emotional and mental state merited updated examination); *Sadler*, 263 F.R.D. at 335-37 (referring to various changes in circumstance, including changes in cognitive and behavioral functioning, as well as medications); *Kuithe v. Gulf Caribe Mar., Inc.*, No. CV 08-0458, 2009 WL 10695560, at *5 (S.D. Ala. Mar. 18, 2009) (defendant "is entitled to level the playing field and be well prepared to address the issue of plaintiff's present physical condition and its consequences in the form of damages . . . ."); *see also Sosa v. M/Y Nice Try*, No. 10CV280-JAH (BLM), 2011 WL 13152493, at *2 (S.D. Cal. Sept. 16, 2011).

Both rationales weigh in favor of a follow-up examination here. Indeed, the need for a follow-up examination here is even stronger, given Plaintiff's claim of impaired capacity with respect to the first examination in 2015. Finally, Plaintiff argues, mistakenly, that the "permanent injury/change in condition" analysis does not apply to her because information related to her mental condition is available from other sources. As noted in Part II of this Reply, above, Plaintiff misconstrues the case law on this point.

**IV.    Dr. Winkel proposes to assess Plaintiff's cognitive functioning and the reported validity of reported deficits**

Dr. Borys appears to have taken at face value Plaintiff's assertions that the medications she was using at the time of her 2020 evaluation helped her "rest her mind," and were not overly sedating her as she alleged was the case during the 2015 examination. (Winkel Supp. Declaration, ¶ 5 (referring to Borys Report)). Indeed, Dr. Borys failed to administer objective neuropsychological tests to empirically assess Plaintiff's cognitive status. (Winkel Supp. Declaration, ¶ 6). Likewise, Dr. Borys failed to use objective tests to empirically assess the validity of Plaintiff's verbally reported cognitive status, which is requisite in forensic settings

when a patient raises the issue of cognitive impairment because of the ever-present possibility of malingering in response to external incentives (*e.g.*, enhancing one's reputation, receiving a desired financial award). (*See* Winkel Supp. Declaration, ¶ 7).

Accordingly, as previously articulated in his declaration of September 10, 2020, Dr. Winkel requires a follow-up examination to properly serve as an expert witness in this case. The follow-up examination would include an evaluation of Plaintiff's cognitive functioning with empirical tests, and an assessment of the validity of Plaintiff's reported cognitive dysfunction with empirical psychometric methods. (*See* Winkel Supp. Declaration, ¶¶ 3-4, 9, 12-14). The follow-up examination would also assess Plaintiff's current emotional condition in 2020 and other changes that may impact that condition. (*See* Winkel Supp. Declaration, ¶ 10 & 12).

**V.     Plaintiff's concerns regarding additional testing by Dr. Winkel are baseless**

Plaintiff complains that Dr. Winkel did not specify the particular tests he would administer during a follow-up examination. There is good reason for this: Not revealing ahead of time which tests will be selected decreases the likelihood of becoming familiar with them, which could render the result invalid. (*See* Winkel Supp. Declaration, ¶ 13). But Dr. Winkel has now attached a list of potential tests to his supplemental declaration to address this concern. The tests are frequently utilized by forensic psychologists. (*Id*. at ¶ 14 & Schedule 1).

Plaintiff further complains that re-administering tests that Dr. Borys utilized during her June/July 2020 examination of Plaintiff might raise issues of reliability. These concerns are groundless for two reasons. First, Dr. Winkel does not plan to administer tests utilized by Dr. Borys. (Winkel Supp. Declaration, ¶ 12). Second, even were he to do so, Plaintiff's contention that additional test taking would somehow make Plaintiff more guarded is incorrect – such tests are routinely re-administered to track changes in a patient's condition. (Winkel Supp. Declaration, ¶ 11).

There is nothing out of the ordinary in the process that Dr. Winkel will employ in a follow-up examination, and there is no reason for the Court to restrict or limit the means of examination to be employed by a well-credentialed and licensed practitioner such as Dr. Winkel.

### VI. Plaintiff's assertion that a follow-up examination would constitute improper rebuttal improperly conflates two separate issues

Plaintiff has confused the question of whether Dr. Winkel should be afforded a follow-up examination with the question of whether opinions reached by Dr. Winkel that arise out of a follow-up examination would constitute "affirmative" or "rebuttal" testimony at trial. These are separate questions, and the second issue is not the subject of Defendant's motion.

Suffice it to say that to limit Dr. Winkel's testimony to observations that he made in 2015 because later observations in 2020 would not constitute proper "rebuttal" testimony is to make a hash of civil procedure.

This is not a case where the parties had equal access to Plaintiff during discovery but Defendant failed to conduct a follow-up examination during the time allotted for "affirmative" expert reports. Rather, the Court established a procedure for Defendant to seek a follow-up examination following the disclosure of Dr. Borys's report on August 24, 2020. Defendant followed that procedure. To argue that Defendant cannot seek a follow-up examination because it would constitute "rebuttal" evidence is to negate the procedure established by the Court in the first place. In any event, as discussed at length, above, a follow-up examination is needed for Dr. Winkel to address matters raised in the Borys Report.

### VII. Plaintiff will not be unfairly subjected to litigation stress on account of a follow-up examination

Finally, Plaintiff cannot, on the one hand, pursue a financial recovery through civil litigation in federal court, but, on the other hand, exempt herself from the rules which govern that litigation and which serve to protect the interests of defendants, as well as the interests of plaintiffs alleging injury. "Plaintiff's apparent difficulty with the adversary process cannot form the basis for precluding the defense from appropriate discovery." *Ziemann*, 155 F.R.D. at 502.

Furthermore, Dr. Winkel is cognizant of Plaintiff's concerns and is proposing to conduct a follow-up examination that would be shorter (approximately seven hours over one or two days) and not more stressful than the examination conducted recently by Dr. Borys over three days. (Winkel Supp. Declaration, ¶ 16). Plaintiff, no doubt, would prefer to not have to sit for a follow

Reply in Support of Motion for Follow-up Examination       10
Case No. 1:07-cv-00620-AWI-EPG

up examination, but such an examination is unlikely to harm her wellbeing, as Dr. Winkel notes:

> Plaintiff has been thinking and talking about the alleged causes that prompted her to initiate legal action for over a decade and I do not believe that an additional discussion in the controlled environment of a professional evaluation that must abide by the ethical injunction against inflicting harm (Ethical Principles of Psychologists and Code of Conduct, American Psychological Association, Ethical Standard 3.04) will put her emotional wellbeing at risk.

(Winkel Supp. Declaration, ¶ 17).

### VIII.  Conclusion

For the reasons stated above and in Defendant's moving papers submitted on September 11, 2020, the Court should grant Defendant's motion.

Dated this 22nd day of September, 2020.

    Respectfully submitted,

    RICHARD E. ZUCKERMAN
    Principal Deputy Assistant Attorney General

    */s/ James E. Weaver*
    JAMES E. WEAVER
    Senior Litigation Counsel
    YEN JEANNETTE TRAN
    RYAN S. WATSON
    Trial Attorneys
    U.S. Department of Justice
    Post Office Box 683
    Ben Franklin Station
    Washington, D.C.  20044
    Telephone: (202) 305-4929

    *Of Counsel:*
    MCGREGOR W. SCOTT
    United States Attorney
    Eastern District of California

    *Attorneys for Jean Noll*