RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

JAMES E. WEAVER
Senior Litigation Counsel
YEN JEANNETTE TRAN
RYAN S. WATSON
Trial Attorneys
Tax Division, U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C.  20044
(202) 305-4929 (v)
(202) 307-0054 (f)
James.E.Weaver@usdoj.gov
Y.Jeannette.Tran@usdoj.gov
Ryan.Watson@usdoj.gov

*Of Counsel:*
MCGREGOR W. SCOTT
United States Attorney
Eastern District of California

*Attorneys for Jean Noll*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLY IOANE,<br><br>                  Plaintiff,<br><br>         v.<br><br>JEAN NOLL,<br><br>                  Defendant. | No.  1:07-CV-00620-AWI-EPG<br><br>**OPPOSITION TO PLAINTIFF'S REQUEST FOR RECONSIDERATION OF RULE 35 ORDER OF SEPTEMBER 25, 2020** |

## I.      Introduction

This case will be tried to a jury next year.  Both parties intend to present expert testimony on the causes of Plaintiff's alleged emotional distress:  Plaintiff plans to call Dr. Debra Borys; Defendant plans to call Dr. Ricardo Winkel.  But while Dr. Borys recently conducted a psychological examination of Plaintiff during June and July 2020 (with Plaintiff's cooperation),

1

1    Dr. Winkel last examined Plaintiff pursuant to court order over five years ago in September 2015,

2    at a time when Plaintiff now claims she was cognitively impaired and unable to provide reliable

3    information to Dr. Winkel – and prior to five additional years of alleged ongoing injuries for

4    which Plaintiff seeks compensation.

5           "One of the purposes of Rule 35 is to 'level the playing field' between parties in cases in

6    which a party's physical or mental condition is in issue." *Ragge v. MCA/Universal Studios*, 165

7    F.R.D. 605, 608 (C.D. Cal. 1995) (citations omitted).  Since a plaintiff has ample access to

8    examinations by treating or forensic professionals, it is only fair to place Defendant on equal

9    footing.  *See id*.  Here, only an order compelling a follow-up examination of Plaintiff by Dr.

10   Winkel can prevent this case from proceeding to trial on very unequal footing.

11          **II.      The Rule 35 Order should be afforded deference and not overruled.**

12          On September 25, 2020, following briefing by the parties and a hearing on Defendant's

13   motion, Magistrate Judge Grosjean entered an Order Granting Motion for Follow-Up

14   Psychological Examination of Plaintiff Shelly Ioane Pursuant to Federal Rule of Civil Procedure

15   35. (Dkt. No. 578) (the "Rule 35 Order").  The Rule 35 Order evaluated evidence submitted by

16   the parties. (Rule 35 Order at 2:2-3:8).  The Rule 35 Order found that there was good cause to

17   grant Defendant's motion:

18          The Court finds that the significant time lag since the first examination by Dr.
19          Winkel, in combination with the purported change in Plaintiff's mental status since
            that examination, provide good cause for a second examination by Dr. Winkel.
20
     (Rule 35 Order at 3:9-11) (citations omitted).

21          In addition, the order incorporated findings that the Court stated on the record during the

22   September 25, 2020 hearing.  (Rule 35 Order at 3:17-18).  Those findings are reflected in the

23   transcript of the hearing.  (Dkt. No. 583 at 1:19-8:10) (the "Hrg. Tr.").  Further, the transcript

24   reflects that the Court carefully weighed considerations advanced by both parties in crafting the

25   scope of, and the specific terms of, the follow-up examination, including a provision barring Dr.

26   Winkel from soliciting Plaintiff's recollections of the June 8, 2006 search and a provision

27   restricting access to any recording of the examination.  (*See e.g.*, Hrg. Tr. at 9:5-14:25; 20:16-

28

22:7; 29:19-36:14; 43:4-46:9; *see als*o Rule 35 Order at 3:19-5:11).

A ruling by a magistrate judge on a non-dispositive matter should be given deference unless the order is "clearly erroneous or contrary to law." *See Grimes v. City and County of San Francisco*, 951 F. 2d 236, 241 (9th Cir. 1991) (citations omitted); *see also* 28 U.S.C. § 636(b)(1); Local Rule 303(f). An order is clearly erroneous "only if the district court is left with the definite and firm conviction that a mistake has been committed." *See Avalos v. Foster Poultry Farms*, 798 F. Supp. 2d 1156, 1160 (E.D. Cal. 2011) (citation omitted). "This standard is significantly deferential." *See McCoy v. Kelso*, 1:12-cv-0983-AWI-SAB, 2020 WL 5237543, at *1 (E.D. Cal. Sept. 2, 2020) (citation omitted). The reviewing court may not substitute its judgment for that of the deciding court. *Id*. at * 1 (citations omitted). An order is "contrary to law" if it fails to apply or misapplies the existing law including case law, statues, or rules of procedure. *See id.* (citations omitted).

Here, the findings of good cause underlying the provisions of the Rule 35 Order are well-supported by the evidence. They are also supported by prevailing law. The Court should therefore deny Plaintiff's request for reconsideration.

### III.    Relevant facts demonstrate good cause for a follow-up examination.

On February 18, 2020, and over Defendant's objection, Magistrate Judge Grosjean granted Plaintiff's request to reopen expert discovery, which had been closed for several years.[1]

---

[1] Plaintiff complains that Magistrate Judge Grosjean has "issued a series of unusual pro-Defendant rulings that were wrongly decided. . . ." This complaint is incorrect and overlooks the fact that the Court not only reopened expert discovery at Plaintiff's request, but also took Plaintiff's allegations of hardship into account in crafting the scope of the follow-up examination.

Moreover, it is Plaintiff and her counsel who have recently engaged in "unusual" litigation tactics by: (1) flouting discovery rules by disclosing the identity of, and/or contact information for, persons with discoverable information only after the close of fact discovery (*see* Dkt. No. 537 at 20:17-23:7 (joint statement)); (2) filing a groundless motion for sanctions that was summarily denied (*see* Dkt. No. 549 at 50:22-51:12 & 54:4-19 (6/19/2020 transcript)); (3) indicating to the Court that Plaintiff's counsel did not represent fact witnesses to be deposed (*see* Dkt. No. 549 at 43:17-48:2 & 56:13-19 (6/19/2020 transcript)) only to later offer legal advice to some of the unrepresented witnesses on whom Defendant sought to serve subpoenas (Dkt. No. 564 at 7:25-14:15 (8/28/2020 transcript)), only to, still later, have Plaintiff's counsel end up representing most of the witnesses during their respective depositions; (4) claiming Dr. Winkel violated ethical obligations for following a procedure for transmittal of requested test information after the

1   (Dkt. No. 507 at 2:24-5:8).  Plaintiff subsequently disclosed expert witness Dr. Debra Borys, who

2   opines on Plaintiff's alleged emotion distress in her report (the "Borys Report").  Following the

3   disclosure, Defendant timely contacted the Court to request an expedited briefing schedule for

4   seeking a follow-up psychological examination of Plaintiff by Dr. Winkel, a licensed

5   psychologist retained by Defendant.  (*See* Dkt. No. 527 at 2:22-26).  After an informal discovery

6   dispute conference, the parties stipulated to a schedule for briefing and, in the event that the Court

7   grant Defendant's motion, a schedule for conducting the follow-up examination on an expedited

8   basis.  (Dkt. Nos. 562 & 563).

9          Defendant has articulated good cause for seeking follow-up Rule 35 examination:

10         First, the Borys Report portrays prior the 2015 examination by Dr. Winkel as something

11  of a sham:  Plaintiff was purportedly too overly-drugged to provide Dr. Winkel with reliable

12  information, as noted in the Rule 35 Order.  (Dkt. No. 578 at 2:7-3:2).  There can be no doubt that

13  Plaintiff will contend, and Dr. Borys will opine at trial, that the conclusions drawn by Dr. Winkel

14  based on his 2015 examination are unreliable because Plaintiff was in a drugged-up state.

15  Plaintiff's counsel says as much:  "The Borys Report suggests that the results of the psychological

16  testing conducted during the examination may be unreliable given that Mrs. Ioane was

17  overmedicated at the time."  (*Id.* at 2:4-5).  Under these circumstances, it would be unfair to

18  preclude Defendant from obtaining an order for a follow-up examination.  Indeed, if Plaintiff is to

19  be believed, a follow-up examination by Dr. Winkel would be ***more*** than a mere follow-up.  It

20  would be the first time Dr. Winkel would have seen Plaintiff in the more stable mental state she

21  was supposedly in during the recent examination by Dr. Borys.

22         Second, Plaintiff's condition has, according to the Borys Report, changed since Dr.

23  Winkel's examination.  Although the 2020 Borys Report addresses issues of Plaintiff's cognition,

24  both at the time of the 2015 examination and also in 2020, at the time of the Borys examination,

25  _____

26  procedure had been discussed with the Court during an informal conference (*see* Dkt. No. 550 at
    2:8-8:14 (order)); and (5) most recently, seeking to belatedly undo an express, intentional and
    strategic decision to forego taking Defendant's deposition during fact discovery, a decision

27  communicated to the Court in April 2020 in hopes of advancing Plaintiff's argument for not
    extending fact discovery deadlines, thereby precluding Defendant from further discovery as to

28  Plaintiff's late-disclosed witnesses (*see* Dkt. No. 564 at 3:21-7:24 (8/28/2020 transcript)).

1   Dr. Borys looked past these issues, failing to administer objective neuropsychological tests to

2   empirically assess Plaintiff's cognitive status or the validity of Plaintiff's verbally reported

3   cognitive status.  (*See* Winkel Supp. Declaration, Dkt. No. 574 at ¶¶ 4-9; *see also* Winkel

4   Declaration, Dkt. No. 567 at ¶¶ 14-16).[2]  The alleged disparity in Plaintiff's cognitive functioning

5   over time now merits close examination by Dr. Winkel.  To address the opinions reached by Dr.

6   Borys, it is critical to do what she failed to do:  administer cognitive and validity testing.

7        Third, fact that Dr. Borys examined Plaintiff in 2020 while Dr. Winkel's examination

8   occurred more than five years ago in 2015, prior to events for which Plaintiff claims injury, is, in

9   and of itself, grounds for ordering a follow-up examination.  (*See* Winkel Declaration, Dkt. No.

10  567 at ¶¶ 17-20; *see also* Winkel Supp. Declaration, Dkt. No. 574 at ¶ 10).

11
12  **A.  Plaintiff questions the reliability of Dr. Winkel's examination on account of a previously-undisclosed impairment during the examination.  That alone merits a re-examination of Plaintiff by Dr. Winkel.**

13       On June 30, 2015, the Court ordered that Plaintiff Shelly Ioane appear for a psychological

14  examination to be conducted by Dr. Winkel on July 15, 2015.[3]  (Dkt. No. 329 at 9:6-17).

15  Although audio recordings of such examinations are disfavored, the Court noted Plaintiff's

16  request for a recording of the examination and permitted Dr. Winkel to make a recording.  (*Id.* at

17  6:10-21 & 9:6-17).  Mrs. Ioane failed to appear for her examination, and, on August 18, 2015, the

18  Court sanctioned Plaintiff for not appearing. (Dkt. No. 347 at 10:2-4).  Ten days later, on August

19  28, 2020, the Court ordered Mrs. Ioane to personally appear for a scheduling conference on

20  September 3, 2015.  (Dkt. No. 351).  She did so on September 3, 2015.  (Dkt. No. 356).

21       Following the court conference, Mrs. Ioane appeared on September 15, 2015 for the first

22  of two half-day examinations conducted by Dr. Winkel, and she appeared on September 20, 2015

23

24  [2] The testing conducted by Dr. Borys in 2020, as well as Dr. Winkel's testing of Plaintiff in 2015, concerned issues of alleged personality and emotional functioning.  (*See id.*)

25
26  [3] In Defendant's brief filed on September 11, 2020, Defendant mistyped the date of Dkt. No. 329 as June 15, 2015 rather than June 30, 2015.  (Dkt. No. 566 at 7:18).  Defendant corrects this error here.  Further, Defendant's brief assigned the date of August 28, 2015 to both Dkt. Nos. 347 and

27  351, whereas Dkt. No. 347 was entered on August 18, 2015.  (Dkt. No. 566 at 7:23-26). Defendant corrects this error here, as well.  Neither is material to the recitation of facts in

28  Defendant's brief.

1  for the second part of the examination.  (Dkt. No. 567‑1 at p. 2).   Dr. Winkel recorded the

2  examination, and the recording was subsequently transcribed.  (*See* Winkel Declaration, Dkt. No.

3  567 at ¶ 8; *see also* Dkt. No. 567‑2).

4          During the first day of the examination, Mrs. Ioane recounted details of an alleged panic

5  attack she had suffered, an attack triggered by case-related events that preceded her examination.

6  (Dkt. No. 567‑2 at 44:3-48:27; *see also* Dkt. No. 356).  Following this attack, Mrs. Ioane saw her

7  general practitioner, Dr. Shabbir, who gave her medication.  (*Id*. at 49:1-24). Dr. Winkel inquired

8  about her medication and was told by Plaintiff that she had been instructed by her general

9  practitioner to "go back and see" her psychiatrist, Dr. Castillo, who would put her "back on

10  stronger medications."  (Dkt. No. 567‑2 at 49:1-15; 51:13-18).  Although Plaintiff had previously

11  seen her psychiatrist, she had stopped due to financial constraints.  (Dkt. No. 567‑2 at 49:25-

12  51:28; 109:14-28).  The anxiety pills prescribed by her general practitioner, the medicine Plaintiff

13  was taking on the first day of her examination, had a smaller effect, and the medicine was not

14  helping her much.  (*See* Dkt. No. 567‑2 at 53:19-54:4).

15          Dr. Winkel returned to the subject of Mrs. Ioane's medications during the second day of

16  the examination.  (Dkt. No. 567‑2 at 100:20-101:22; 106:24-109:27).  Although Plaintiff had

17  previously seen Dr. Castillo for about six months, she had, apparently, tapered off of Dr.

18  Castillo's stronger medications when she stopped seeing him.  (*See id*.)

19          During the 2015 examination, Dr. Winkel did not observe evidence of Mrs. Ioane being

20  heavily sedated during his examination in 2015.  (Winkel Declaration, Dkt. No. 567 at ¶ 10).

21  Indeed, he wrote in his 2015 report that Plaintiff "was fully alert and oriented but frequently

22  seemed overwhelmed and confused."  (Dkt. No. 567‑1 at p. 14).

23          In contrast, the 2020 Borys Report seeks to portray an entirely different picture of Mrs.

24  Ioane in 2015:

25          She said she saw [Dr. Winkel] after she had started taking the anxiety medication
26          that heavily sedated her. From Dr. Castillo's records, this appeared to be Klonopin,
          which he does reduce due to over-sedation. She continued to report some difficulty
27          awakening to him thereafter, and did so in self-report to this examiner, even on a
          lower dose). Shelly said that as a result of her level of sedation at the time, she
28

could not drive herself to the appointment with Dr. Winkel on her own. She said that her daughter "warned" Dr. Winkel about Shelly's degree of sedation and told him about at least one of her first two big breakdowns.[4]

(Dkt. No. 568‑1, Borys Report at p. 12-13).[5]

The Borys Report further calls into question the reliability of the psychological testing conducted by Dr. Winkel in 2015 on the basis of Mrs. Ioane having been overly-drugged and not alert:

> Shelly reported that at some point after a period of interviewing, Dr. Winkel set Shelly up in a room to answer one or more questionnaires. When he returned after a period of time, he asked her a series of verbal questions that were required to be answered with either a Yes or No only. She recalled that there were a lot of questions in that forced choice juncture that pertained to suicide. She said the repeated questions made her realize that she wanted it all to end--the pain and not having to deal with the legal matters anymore. [The combination of heavy sedation and the possibility of having the MFAST or SIRS questions she seemed to be describing interposed between parts of the PAI or MCMI, if that is what happened, may have contributed to higher situational stress being experienced and certainly a disruption in focus]. He then had her resume her solitary work on questionnaires. While working on either one or both of the longer questionnaires (the MCMI-III is [redacted] items and the PAI is close to [redacted]; the DAPS is [redacted] and much more engaging for respondents than the PAI and MCMI-III's formats and question type), she said she was having a lot of difficulty with answering the questions at that point due to her level of sedation. She said she kept falling asleep and would awaken when Dr. Winkel would come in and check how she was doing. She said that eventually she ended up sitting on the floor to work, because it was physically uncomfortable and thus kept her awake.

(Dkt. No. 568‑1, Borys Report at p. 13) (number of test questions redacted by undersigned).

---

[4] It is worth noting that, in the transcript of the 2015 examination, it appears to be Mrs. Ioane's son, rather than her daughter, who accompanied her to the first day of the examination. (*See* Dkt. No. 567-2 at 44:3-5). And, moreover, although her daughter may have been the driver for the second day of the 2015 examination, her daughter has no recollection of saying anything to Dr. Winkel, if she ever met him. (Dkt. No. 568-3 at 51:5-55:12). Dr. Winkel has no recollection of speaking with Mrs. Ioane's daughter. (Winkel Declaration, Dkt. No. 567 at ¶ 10).

[5] Dr. Borys circumvents the issue of how Mrs. Ioane could have been taking Klonopin in September 2015 when, according to Plaintiff herself, Plaintiff had not yet resumed seeing Dr. Castillo (Dkt. No. 567-2 at 100:20-101:22; 106:24-109:27), by hypothesizing that the 2015 panic attack sequence occurred in 2014, not 2015. (*See* Dkt. No. 568-1, Borys Report at p. 7-8).

Accordingly, Dr. Borys interprets certain 2015 test results as suspect:

> On the PAI, Dr. Winkel reported that Shelly came out elevated on the Infrequency (INF) validity scale, which suggests a problem with attention, concentration, or answering randomly (i.e., without sufficient attention to the meaning of the item). [Comment: This INF result would be consistent with her report of repeatedly dozing off, which indicates inability to stay alert and focused. . . .]"

(Dkt. No. 568-1, Borys Report at p. 35).

In contrast, Dr. Borys recounts a much-improved ability on the part of Plaintiff to take psychological tests during her 2020 examination:

> This strongly suggested she maintained her alertness and focus, and worked at a deliberate pace, neither obsessive nor rushed. She did not appear drained when finished and reported that her mental state and energy level completing the tests during this evaluation was vastly different than that while completing testing and indeed the entire evaluation with Dr. Winkel, which she attributed primarily to the difference in how much less sedated she felt from her medication now. (In addition to taking less anxiolytic medication, she had not been taking the mood stabilizers Gabapentin and Lamotrigine yet at the time she saw Dr. Winkel).

(Dkt. No. 568-1, Borys Report at p. 15).

In short, according to Plaintiff, she has now, in 2020, "gotten acclimated to the medication she is on," and no longer overly-sedated.  (Dkt. No. 568-1, Borys Report at p. 13).  Accordingly, Dr. Winkel should have an opportunity to examine the Plaintiff in her current condition.

### B.  Dr. Winkel should be afforded an opportunity to contemporaneously examine Plaintiff, given an apparent changes in Plaintiff's mental condition following his 2015 examination and the alleged ongoing nature of her injuries.

As noted above, Plaintiff's altered drug regimen, and the alleged change in her cognitive state, constitute changed circumstances that merit a follow-up examination.  Dr. Borys appears to have taken at face value Plaintiff's assertions that the medications she was using at the time of her 2020 evaluation helped her "rest her mind," and were not overly sedating her as she alleged was the case during the 2015 examination.  ((*See* Winkel Supp. Declaration, Dkt. No. 574 at ¶ 5 (referring to Borys Report)).  Indeed, Dr. Borys failed to administer objective neuropsychological tests to empirically assess Plaintiff's cognitive status.  (*Id.* at ¶ 6).  Likewise, Dr. Borys failed to

1  use objective tests to empirically assess the validity of Plaintiff's verbally reported cognitive

2  status, which is requisite in forensic settings when a patient raises the issue of cognitive

3  impairment because of the ever-present possibility of malingering in response to external

4  incentives (*e.g.*, enhancing one's reputation, receiving a desired financial award).  (*See id* at ¶ 7).

5        Accordingly, Dr. Winkel requires a follow-up examination to properly serve as an expert

6  witness in this case. The follow-up examination would include an evaluation of Plaintiff's

7  cognitive functioning with empirical tests, and an assessment of the validity of Plaintiff's reported

8  cognitive dysfunction with empirical psychometric methods.  (*See* Winkel Supp. Declaration,

9  Dkt. No. 574 at ¶¶ 3-4, 9, 12-14).  The follow-up examination would also assess Plaintiff's

10  current emotional condition in 2020 and other changes that may impact that condition. (*See id.* at

11  ¶¶ 10 & 12).

12        Plaintiff's contention that her damages are of a permanent and ongoing nature constitutes

13  a material change from information she conveyed to Dr. Winkel in 2015.  (*See* Dkt. No. 567-2 at

14  111:6-114:28).

15
16        Q. After a year or so, you felt okay, and then when
    you got notice by mail that the case was moving forward,
    you panicked?
17        A.      Yes.

18        (Dkt. No. 567-2 at 112:2-5).

19              **C.  The significant time lag since Dr. Winkel's 2015 examination and the trial
                date in 2021 also constitutes good cause for a follow up examination.**
20
        Dr. Borys reports that "[a]fter the search warrant case was lost, Shelly believes she had at
21
    least four more breakdowns or trigger reactions. . . ."  (Dkt. No. 568-1, Borys Report at p. 10).
22
    These alleged breakdowns may include an alleged attack during or following a hearing on
23
    motions *in limine* on August 22, 2016, described in an affidavit and supporting documents
24
    Plaintiff submitted to the Court by Plaintiff on or about September 6, 2016.  (Dkt. No. 450).
25
    They may include incidents involving hospitalization and incapacity.  (*See* Dkt. No. 568-3 at
26
    149:19-151:20) (discussing alleged severe incidents).  In addition, there may have been other less
27
    severe breakdowns.  (*See* Dkt. No. 568-2 at 119:2-121:10).
28

Although Dr. Borys attributes alleged breakdowns and attacks to the 2006 IRS search, other factors that may have transpired in the intervening years that merit consideration by Dr. Winkel, (*e.g.* reunion with her husband, family conflicts, financial distress, unfolding litigation) may have impacted Plaintiff's condition and require analysis.  (Winkel Declaration, Dkt. No. 567 at ¶ 17).  Dr. Winkel should be afforded an opportunity to analyze whether post-2015 events and breakdowns may arise from other causes, such as litigation stress or anxiety, for example. "'Federal court decisions are unanimous in holding that litigation-induced stress may not be recovered as damages.'" *Wright v. Watkins and Shepard Trucking, Inc.*, 11-cv-CV01575-LRH-GWF, 2016 WL 10749220, at *10 (D. Nev. Jan. 19, 2016) (*quoting Picogna v. Bd. of Educ. of Twp. of Cherry Hill*, 143 N.J. 391, 397-99, 671 A.2d 1035, 1038-39 (1996)); *see also Flowers v. First Hawaiian Bank*, 295 F. Supp. 2d 1130, 1140 (D. Haw. 2003) ("Litigation stress is not recoverable as damages.") (citations omitted).

In short, there is good cause for a follow-up examination.  "'Certainly, the injured party would not expect to go to trial without an up-to-date examination by his own physician. Upon what logic should the opposing party be denied the right to be equally well prepared to present the issue?'" *Edson v. Liberty Mut. Ins. Co.*, No. C-01-3128, 2002 WL 31946902, at *2 (N.D. Cal. Oct. 4, 2002) (q*uoting Vopelak v. Williams*, 42 F.R.D. 387, 389 (N.D. Ohio 1967)).

**IV.    Case precedent weighs in favor of a follow-up examination.**

Rule 35 does not limit a defendant to a single examination or "restrict the number of evaluations that a party may be required to undergo."  *Ziemann v. Burlington County Bridge Commn.*, 155 F.R.D. 497, 501 (D.N.J. 1994) (*citing Moore v. Calavar Corp.*, 142 F.R.D. 134, 135 (W.D.La.1992)).  Each Rule 35 request "necessarily turns on its own facts. . . ." *Id.*  Some courts require a "stronger showing" when the requesting party has earlier conducted an examination, either prior to, or after initiation of a lawsuit.  *See Edson*, at *1 (N.D. Cal. Oct. 4, 2002) (*citing Vopelak v. Williams*, 42 F.R.D. 387, 389 (N.D.Ohio 1967); *see also* 7 Moore's Federal Practice, Civil § 35.04; Charles Alan Wright, et al., 8B Fed. Prac. & Proc. Civ. § 2234 (3d ed.).

Courts have deemed this "stronger showing" to be made where a plaintiff's relevant

1   circumstances have changed since an earlier examination or, alternatively, plaintiff is alleging

2   permanent or ongoing injuries and there is a significant gap between the earlier examination and

3   trial date.  *See Ziemann*, 155 F.R.D. at 501 (change in mental condition); *Edson*, 2002 WL

4   31946902, at *1-2 (where plaintiff alleged permanent injury and the prior examination was two

5   years old, defendant entitled to a more current examination).

6          Thus, where a substantial time lag occurs between the initial examination and trial, courts

7   have found "good cause" to allow multiple examinations. *See Sadler v. Acker*, 263 F.R.D. 333,

8   336 (M.D. La. 2009) (time lag between the initial examinations conducted by defense experts and

9   the time of trial, and a change in Plaintiff's situation since initial exams, constituted good cause

10  for re-examination and testing prior to trial); *Galieti v. State Farm Mutual Automobile Insurance

11  Co.*, 154 F.R.D. 262, 263 (D. Colo. 1994) ("The previous . . . professionals have not seen Plaintiff

12  for some period of time. Plaintiff's present . . . condition is at issue. A further evaluation . . . is

13  appropriate").

14         Case law is also clear that a follow-up examination is merited where there is a change in

15  circumstances following an earlier examination. *See Ziemann*, 155 F.R.D. at 501-502

16  (deterioration of emotional and mental state merited updated examination); *Sadler*, 263 F.R.D. at

17  335-37 (referring to various changes in circumstance, including changes in cognitive and

18  behavioral functioning, as well as medications); *Kuithe v. Gulf Caribe Mar., Inc.*, No. CV 08-

19  0458, 2009 WL 10695560, at *5 (S.D. Ala. Mar. 18, 2009) (defendant "is entitled to level the

20  playing field and be well prepared to address the issue of plaintiff's present physical condition and

21  its consequences in the form of damages . . . ."); *see also Sosa v. M/Y Nice Try*, No. 10CV280-

22  JAH (BLM), 2011 WL 13152493, at *2 (S.D. Cal. Sept. 16, 2011).

23         *Ziemann* is directly on point.  There, a change in plaintiff's mental condition was

24  paramount to the Court's decision to order additional examinations under Rule 35, including a

25  second examination by the defendant's psychiatric expert. 155 F.R.D. at 501-02. The court

26  explained:

27         Given this significant change in Ziemann's mental condition, it is clear that
           defendants' current evaluation is incomplete and that the defendants should be

28

allowed to examine plaintiff as to these developments. While the court is loathe to subject plaintiff to unnecessary examination, it must be noted that Ziemann, as the plaintiff in this matter, cannot be permitted to avoid her discovery responsibilities.

*Id*. at 501.

Both rationales weigh in favor of a follow-up examination here. Indeed, the need for a follow-up examination here is even stronger, given Plaintiff's claim of impaired capacity with respect to the first examination in 2015.

### A. There are no other viable means for providing Dr. Winkel with information he needs to evaluate Plaintiff's cognition and Plaintiff's present condition.

Plaintiff has wrongly suggested that Defendant should be satisfied with information that may be gleaned by other means, such as depositions or information contained in medical records. *See* Dkt. 571, Plaintiff's Response, at 8:4-12 (quoting the case of *Winstead v. Lafayette County Bd. of County Commissioners*, 315 F.R.D. 612, 617 (N.D. Fla. 2016)).  But Plaintiff's Response omitted a key point of analysis in the *Winstead* case, one that clearly supports Defendant's position here:

> **Things are different when a plaintiff seeks to prove her emotional injuries through retained expert, rather than treating physician, testimony.** Although there appears to be near-universal agreement about this principle*, see, e.g., Duncan v. Upjohn Co.*, 155 F.R.D. 23, 25 (D.Conn.1994), courts don't often discuss the reasons behind the difference in treatment. . . .
>
> But one policy-based reason for the difference in treatment seems obvious: a plaintiff should not be effectively punished for seeking treatment, particularly when that treatment was initially sought (as it was here) prior to the onset of litigation. **In contrast, a plaintiff who submits to an evaluation by an expert chosen by her lawyer is not seeking treatment—she's trying to advance her litigation position. Forcing such a plaintiff to submit to a similar examination conducted by a different expert (one likely chosen by the opposing party) is not a punishment, but a leveling of the playing field.**

*Winstead*, 315 F.R.D. at 616 n.3 (emphasis added).

Indeed, "[w]hat does establish good cause and authorizes a Rule 35 examination in this case is the [plaintiff's] stated intent to prove [her] emotional injuries with the testimony of a retained expert." *T.C on Behalf of S.C. v. Metro. Govt. of Nashville and Davidson County, Tennessee*, 3:17-CV-01098, 2018 WL 3348728, at *12 (M.D. Tenn. July 9, 2018) (citations

1    omitted).

2         The idea that one party should be satisfied with "other means" of discovery when the

3    other party is proffering expert testimony runs counter to case law:

4         Furthermore, one purpose in granting a request for a psychiatric examination
5         pursuant to Rule 35 is to "preserve[ ] the equal footing of the parties to evaluate
          the plaintiff's mental state...." *Tomlin*, 150 F.R.D. at 633. **Thus, while plaintiff**
6         **has produced voluminous medical records and reports, which he claims are**
          **sufficient to evaluate his mental state at all relevant times, this production**
7         **does not necessarily negate the defendant's interest in an independent**
          **examination of the plaintiff.** Only if no additional relevant information could be
8         gained by an examination of Mr. Duncan should the motion for a psychiatric
          examination be denied. *Schlagenhauf*, 379 U.S. at 118, 85 S.Ct. at 242 (holding
9         availability of information from another source is a relevant consideration).

10   *Duncan v. Upjohn Co.*, 155 F.R.D. 23, 25 (D. Conn. 1994) (emphasis added).

11        Plaintiff relied in her Response (Dkt. No. 571) on other inapposite case law.  For example,

12   Plaintiff's reliance on the case of *Acosta v. Tenneco Oil Co.*, 913 F.2d 205 (5th Cir. 1990), was

13   misplaced.  First, in *Acosta*, unlike this case, the court ruled that the plaintiff had not placed his

14   mental condition in controversy.  913, F.2d at 209.  Second, *Acosta* may not even be good law:

15
16        Plaintiff's other objections can be disposed of briefly. (1) [plaintiff] provides no
          authority, and the Court knows of none, for the proposition that defendant must
17        exhaust all other avenues of discovery before seeking independent mental
          examinations. (2) *Acosta v. Tenneco Oil Co.*, 913 F.2d 205, 209 (5th Cir.1990),
18        does not assist plaintiff, for it held only that Rule 35 does not authorize a mental
          examination by a vocational rehabilitation expert, and the holding in *Acosta*
19        appears to have been abrogated by subsequent amendment of Rule 35. *See Fischer
          v. Coastal Towing Inc.*, 168 F.R.D. 199, 201 (E.D.Tex.1996) ("A 'suitably
20        licensed or certified examiner' under Rule 35 includes a vocational-rehabilitation
          expert.") . . .
21
22   *Jackson v. Entergy Operations, Inc.*, CIV.A. 96-4111 & 97-0943, 1998 WL 28272, at *1 n.1

23   (E.D. La. Jan. 26, 1998).

24        Plaintiff's reliance on cases such as *Shumaker v. West*, 196 F.R.D. 454 (S.D. W.Va. 2000)

25   and *Marroni v. Matey*, 82 F.R.D. 371, 372 (E.D. Pa. 1979), is equally unavailing.  Those cases do

26   not contain discussions as to whether plaintiff had retained a testifying expert for purposes of

27   litigation, making them inapposite to the facts here.

     //
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B. Plaintiff's concerns regarding additional testing by Dr. Winkel are baseless.**

Plaintiff complains that Dr. Winkel did not specify the particular tests he would administer during a follow-up examination. There is good reason for this: Not revealing ahead of time which tests will be selected decreases the likelihood of becoming familiar with them, which could render the result invalid. (*See* Winkel Supp. Declaration, Dkt. No. 574 at ¶ 13). But Dr. Winkel has attached a list of potential tests to his supplemental declaration to address this concern. The tests are frequently utilized by forensic psychologists. (*Id*. at ¶ 14 & Schedule 1).

Plaintiff further complains that re-administering tests that Dr. Borys utilized during her June/July 2020 examination of Plaintiff might raise issues of reliability. These concerns are groundless. Dr. Winkel does not plan to administer tests utilized by Dr. Borys. (Winkel Supp. Declaration, Dkt. No. 574 at ¶ 12). There is nothing out of the ordinary in the process that Dr. Winkel will employ in a follow-up examination, and there is no reason for the Court to restrict or limit the means of examination to be employed by a well-credentialed and licensed practitioner such as Dr. Winkel.

**C. Plaintiff's assertion that a follow-up examination would constitute improper rebuttal improperly conflates two separate issues.**

Plaintiff has confused the question of whether Dr. Winkel should be afforded a follow-up examination with the question of whether opinions reached by Dr. Winkel that arise out of a follow-up examination would constitute "affirmative" or "rebuttal" testimony at trial. These are separate questions, and the second issue is not the subject of Defendant's motion.

Suffice it to say that to limit Dr. Winkel's testimony to observations that he made in 2015 because later observations in 2020 would not constitute proper "rebuttal" testimony is to make a hash of civil procedure. This is not a case where the parties had equal access to Plaintiff during discovery but Defendant failed to conduct a follow-up examination during the time allotted for "affirmative" expert reports. Rather, the Court established a procedure for Defendant to seek a follow-up examination after the disclosure of Dr. Borys's report on August 24, 2020. Defendant followed that procedure. To argue that Defendant cannot seek a follow-up examination because it

would constitute "rebuttal" evidence is to negate the procedure established by the Court in the first place.  In any event, as discussed at length, above, a follow-up examination is needed for Dr. Winkel to address matters raised in the Borys Report.

### D.  Plaintiff will not be unfairly subjected to litigation stress on account of a follow-up examination.

Finally, Plaintiff cannot, on the one hand, pursue a financial recovery through civil litigation in federal court, but, on the other hand, exempt herself from the rules which govern that litigation and which serve to protect the interests of defendants, as well as the interests of plaintiffs alleging injury. "Plaintiff's apparent difficulty with the adversary process cannot form the basis for precluding the defense from appropriate discovery."  *Ziemann*, 155 F.R.D. at 502.

Furthermore, Dr. Winkel is cognizant of Plaintiff's concerns and is proposing to conduct a follow-up examination that would be shorter (approximately seven hours over one or two days) and not more stressful than the examination conducted recently by Dr. Borys over three days. (Winkel Supp. Declaration, Dkt. No. 574 at ¶ 16).  Plaintiff, no doubt, would prefer to not have to sit for a follow up examination, but such an examination is unlikely to harm her wellbeing, as Dr. Winkel notes:

> Furthermore, Plaintiff has been thinking and talking about the alleged causes that prompted her to initiate legal action for over a decade and I do not believe that an additional discussion in the controlled environment of a professional evaluation that must abide by the ethical injunction against inflicting harm (Ethical Principles of Psychologists and Code of Conduct, American Psychological Association, Ethical Standard 3.04) will put her emotional wellbeing at risk.

(*Id*. at ¶ 17).

### V.    Conclusion

For the reasons stated above and in Defendant's moving papers submitted on September 11, 2020 and September 22, 2020, the Court should deny Plaintiff's request for reconsideration and should not overrule the Rule 35 Order.

//

//

//

1    Dated this 5th day of October, 2020.

2

3                                              Respectfully submitted,

4                                              RICHARD E. ZUCKERMAN
                                               Principal Deputy Assistant Attorney General
5
                                               */s/ James E. Weaver*
6                                              JAMES E. WEAVER
                                               Senior Litigation Counsel
7                                              YEN JEANNETTE TRAN
                                               RYAN S. WATSON
8                                              Trial Attorneys
                                               U.S. Department of Justice
9                                              Post Office Box 683
                                               Ben Franklin Station
10                                             Washington, D.C.  20044
                                               Telephone: (202) 305-4929
11

12

13                                             *Of Counsel:*
                                               MCGREGOR W. SCOTT
14                                             United States Attorney
                                               Eastern District of California
15
                                               *Attorneys for Jean Noll*
16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Request for Reconsideration            16
Case No. 1:07-cv-00620-AWI-EPG